Good morning. Yes, it is afternoon here. May I please support Jennifer Keeley on behalf of petitioner Eleazar Calmo-Mendoza. I'd like to reserve two minutes for rebuttal. As the IJ found, a group of Ladinos already beat Mr. Calmo-Mendoza with machetes, rendering him unconscious from blood loss in a cruel and inhuman attack. If he is forced to return to Guatemala, he is likely to be tortured by the police or gangs, and thus is entitled to release under the Convention Against Torture. But the agency made multiple fundamental legal errors that, at a minimum, require this court to remand for the agency to re-evaluate his claim. I want to focus today on three specific legal errors. First, the agency impermissibly rejected a considerable amount of the agency's unrepeated, of the required a finding of past torture. And third, the agency required Mr. Calmo- Mendoza to have reported the prior machete attack to the police, even though reporting is not required, and without evaluating whether the patrollers to whom he did report qualified as public officials or others acting in an official capacity. And I want to first start with the agency's improper rejection of a considerable amount of the qualified expert's testimony, a rejection that encompassed far more than just the expert's risk assessment. And I want to start there because that's a legal error that infected the agency's entire analysis, since the expert provided highly relevant testimony that went to every aspect of Mr. Calmo-Mendoza's claim. And the only reason that the agency gave for rejecting a considerable amount of her testimony was that the expert had purportedly provided only broad observations about the indigenous that did not focus on Mr. Calmo-Mendoza's specific circumstances. But that's both belied by the record and misunderstands the role of country conditions evidence. So the expert did provide ample testimony that was specifically tied to Mr. Calmo-Mendoza on both his future risk of harm and government acquiescence. For instance, on risk of harm, I point the panel to AR 206 to 208, where the expert pointed to the prior attack of Mr. Calmo-Mendoza, the fact that Ladinos seek to harm or kill those who were able to flee from a prior attack, the Ladinos' continued visits to his family's land, the subsequent targeting of three of his brothers by Ladinos, Mr. Calmo-Mendoza's status as a returnee from the United States, Mr. Calmo-Mendoza's accent, and use of traditional clothes, all as reasons why he, in particular, would be a likely target upon his return. And then on government acquiescence, at AR 207 and AR 164 to 65, the expert explained that the police in Todos Santos, the area where Mr. Calmo-Mendoza is from, refused to protect the indigenous from harm. And at AR 201, she described an instance where an indigenous was beat and raped by the police and military in connection with the land dispute, and that family was also from Mr. Calmo-Mendoza's region. Council, let me ask you, I'm sorry for interrupting you, let me ask you, if we agree with you that the IJ improperly weighed the expert testimony, or failed to fully account for the expert testimony, do we need to go any further than that? So if the panel agrees that the expert did not, that the agency did not get properly to the expert's testimony, then the proper course would be to remand for the agency to re-evaluate the claim in light of the expert's testimony. I think it would be helpful for the panel to also address some of the other legal errors that the agency made to ensure that those aren't repeated again on remand, such as the requirement of past torture and the requirement that the abuse be reported to the authorities, but the panel could simply address the expert issue and remand on that basis. And as for the expert issue, I also want to point out that the agency's belief that the expert's testimony was too broad just misunderstands the role of country conditions evidence in CAT claims. This court has been clear that country conditions evidence can by themselves establish eligibility for CAT, and country conditions are also one of the regulatory factors that the agency must consider in evaluating eligibility, so it simply misunderstands the role of country conditions evidence for the agency to think that her testimony was too broad. So at this court held in Cole and Castillo, when the agency improperly rejects expert testimony and fails to give reasoned consideration to that testimony, it's per se reversible error requiring a remand. The government, of course, on appeal has taken the position that the agency only gave reduced weight to the expert's quantitative risk assessment, but I think that position is just impossible to reconcile with the agency's opinions here. I point the panel to the IJ's opinion at AR 18, where the IJ specifically discusses the expert's testimony on government acquiescence and says that the expert had painted it was too broad of a brush, and then directly following that, the IJ states that he does reject a considerable amount of the testimony by the expert witness, and nothing about that statement was limited to the expert's quantitative risk assessment, and it would be a little odd to describe a single sentence of her testimony, which was what the quantitative risk assessment was, it was set forth in a single sentence, to be describing that as a considerable amount of her 35 pages of testimony on Mr. Kamel Mendoza's risk of harm. The IJ, of course, rejects the quantitative risk assessment, but that was an additional area, and was certainly not the only area where the agency rejected the expert's testimony, and then the BIA's opinion at AR 2 is equally clear on that point, again, referring to all of the expert's testimony before the IJ, and then affirming the IJ's decision to assign little probative value to that testimony. So, both of the agency's opinions, I think, made clear that the agency was not going to accept the quantitative risk assessment. I then want to move to a second independent legal error, which is that the agency applied a higher burden of proof by requiring Mr. Kamel Mendoza to prove past torture to be eligible for relief. The government has conceded, of course, that past torture is not required, it's just one item in a non-exclusive list of relevant factors, yet the IJ demanded proof of exactly that, stating at AR 18 that each link in the chain that has been asserted here, that the respondent has been tortured and is entitled to relief, must be proved, that unequivocal language demonstrates that he thought that a finding of past torture was required, he said it must be proved, and the IJ never separately evaluated whether Mr. Kamel Mendoza had otherwise established a risk of future torture, which, of course, is a relevant question on your pad. So this case must also be remanded so that the agency can apply the appropriate legal standard and take into account all of the evidence in evaluating Mr. Kamel Mendoza's risk of future torture. And then I now want to turn to the third legal error that I identified, which was the agency's requirement that Mr. Kamel Mendoza report the machete attack to the police. But again, the government has conceded an attack need not be reported. The public officials or others acting in an official capacity only need to be aware that this sort of torture occurs or be in a position where they could have inferred that the torture was taking place. By requiring Mr. Kamel Mendoza to have reported the attack, the agency imposed an impermissible higher burden of proof requiring a remand. And the IJ's opinion, again, makes clear that he thought reporting was necessary, and he faulted Mr. Kamel Mendoza for failing to do so. The IJ stated at AR-16 that since this particular event was not reported to the police, the response of the police therefore cannot be adequately measured in the absence of the report. By applying that higher burden of proof that required the officials to be aware of the specific prior attack on Mr. Kamel Mendoza, the agency legally erred, and on remand, the agency should evaluate all the evidence in the record going to acquiescence consistent with its regulatory duties. That includes the testimony from Mr. Kamel Mendoza's brother that the police refused to assist him when he reported a subsequent attack by the Latinos. That's at AR-227. The testimony from Mr. Kamel Mendoza about the police's refusal to investigate or assist when AR-248. And then all of the testimony from the expert on this point. She testified about the police's refusal to protect the Indigenous, the police force's participation in the beating and breeding of Indigenous persons during land disputes in Mr. Kamel Mendoza's region, and widespread corruption within the police force with the police officers selling information to Latino perpetrators or just handing it over voluntarily. And that's at AR-164-65 and AR-200-201. And then on remand, the agency should also evaluate whether Mr. Kamel Mendoza did, in fact, report the machete attack to public officials or others acting in their official capacity when he reported the attack to patrollers in his rural community. Mr. Kamel Mendoza testified that these patrollers were formed by the law and patrolled the small towns, essentially serving as a substitute for the police in his small village since the closest police station was over four hours away. I point out that at AR-90-91 of the record, when he was asked if he initially reported this attack to the police, he stated that he did, and then he clarified that they called them the patrollers. So the evidence suggests that these patrollers were a substitute for the police in his small town. But the agency never evaluated whether these patrollers qualified as public officials or others acting in their official capacity for purposes of cat relief. While the IJ acknowledged that the patrollers might have had some authority under the law, he concluded that they were not explicitly or expressly a government operation or police agency, which meant in his view that they necessarily could not qualify for purposes of cat. But as this court concluded in Barajas-Romero, the regulation applies to public officials or those acting in an official capacity. Either condition suffices. And so the fact that they were not part of an explicit government agency is not dispositive on that question. And I would point the court to this court's decision in Díaz-Reynoso, which we cited in our brief, which is directly on point. There, this court remanded where the agency had failed to evaluate whether two different authority figures in the petitioner's remote village qualified as public officials for purposes of cat. And the same result should happen here, given the evidence that the patrollers had some legal authority. The agency applied the wrong legal standards here at every turn, which significantly narrowed the type of evidence that the agency considered in evaluating Mr. Kamel Mendoza's eligibility for relief. The agency wanted all of the evidence to be narrowly focused on Mr. Kamel Mendoza himself and the government's failure to intervene, but that's not the standard. We request that this court, at a minimum, remand for the agency to apply the proper legal standards and consider all of the evidence in the record going to Mr. Kamel Mendoza's eligibility for relief, consistent with its regulatory duty. Unless there are further questions, I'll reserve the remaining few seconds for a rebuttal.  Thank you. Good morning, Your Honors. May it please the court, my name is Jessica Strokis, and I represent the United States Attorney General. This court should deny the petition for review. While much in this case is made about the legal issues that pro bono counsel has raised to this court specifically, the facts of this case are fairly simple. Mr. Kamel Mendoza suffered one incident of physical harm more than 20 years ago. He did not endure any lasting effects, and the immigration judge found that this incident did not rise to the level of past torture. In so doing, the immigration judge was analyzing part of the regulatory language that the immigration judge is required to look at. The claim here was that Mr. Kamel Mendoza feared this group of Ladinos from his small town of Todos Santos, Guatemala. And the regulations require that the immigration judge consider did any past harm constitute past torture in part of determining whether or not it was more likely than not that he would be tortured in the future in Guatemala. This one incident occurred again around the year 2000. I'll point this court to a recent decision in Sopanci-Salazar v. Garland, where the court described the type of harm that is necessary to constitute past torture. It is extreme. It is not a single beating. It is not something that does not have a lasting impact on the individual. In Sopanci-Salazar, for example, the incident that occurred was the kidnapped twice and beaten so severely that he actually had lasting hearing damage. And that still did not constitute past torture because it wasn't sufficiently extreme enough. Counsel, as part of the CAC claim, the IJ has to consider the evidence that relates to the possibility of future torture. Can you address the IJ's handling of the expert? Yes, Your Honor. So first, despite the fairly unartful phrasing and an oral opinion by the immigration judge, the immigration judge here did not discount all of the expert witnesses' testimony. In the immigration judge's decision, it's clear from the context of the oral decision that was rendered. Counsel points to a single phrase in the decision that's surrounded by the rest of this decision where the immigration judge is juxtaposing the particularized risk to the immigration judge accordingly and considered. So on page six of the immigration judge's decision, the immigration judge says the expert witness offered observations with a very broad brush about the abysmal conditions faced by members of indigenous peoples or groups, however, did not focus directly on the willful blindness involving the circumstances suffered by this respondent in particular or whether he would be likely to suffer. Then there's the phrase that counsel focused on. The court does reject a considerable amount of the testimony by the expert witness. And then continues saying that she was a zealous advocate, speaking with vigor very quickly, trying to slip in information. And she makes valid points about the abysmal conditions suffered by the indigenous people in Guatemala, but her risk assessment here is wholly unsupported by authority other than her opinion. And your opinion has not been released. As I read the IJ's ruling, it wasn't just the IJ's perception of the expert's testimonies that it painted too broad of a brush and it was not credible because there were no really sources cited. And then the other criticism is that there was no analysis of the petitioner's individual circumstances that related to painting too broad of a brush. But as I see the expert affidavit that submitted that did cite the specific sources and it did analyze the petitioner's individual circumstances. So your honor, how do you square the expert's affidavit against the analysis that was articulated by the IJ? Your honor, I'll point to the remainder of the immigration judge's decision there stating that he does consider the general country conditions and then as well as those that were set forth in the nearly 1,000 pages of country conditions set forth in the record. And the way the government reads that, again this oral decision may be not particularly artful, but the way the government reads that is the immigration judge was discounting this quantitative estimation of risk while accepting her testimony, her vigorous and zealous testimony about country conditions evidence generally. So the issue here isn't that the agency discounted all of her testimony, it didn't. It simply said your quantitative estimation of risk in this case was not tied to anything specific about the petitioner. And for that reason, it's not persuasive. It doesn't satisfy the legal burden here that he needs to satisfy. That goes back to Ming Dai v. Garland or Garland v. Ming Dai with the Supreme Court. In the Supreme Court, the court's opinion said there's a difference. Let me direct your attention to ER 19 and have you respond to the IJ's explanation of why he found the expert incredible. So on ER 19, the IJ said that I find her assessment of risk to be wholly unsupported by authority other than her opinion. Her opinion has not been believed by the court and was found to be incredible based upon the failure to respond as to the source of that information and the lack of information for the responses regarding the likelihood of future torture because it was painted too out of brush. So that's the section I'm really referring to when I think that the IJ was really critical of the fact that there's no sources to support the expert's assessment and that her analysis wasn't individualized enough. Yes, Your Honor. So I think that actually describes what has happened here pretty well. The expert witness was asked, what is the risk that you believe, can you quantify the risk to that Mr. Kamala Mendoza? And she stated she would give a 90% chance that that harm, not torture, that harm would come to him. And she was then asked, can you please explain, can you tell me how you reached that 90% risk of torture? Is it based on your clinical judgment? Do you have some actuarial tools or research that you're relying upon for that 90% chance of future harm in this case? And instead of referring to anything about the petitioner specifically, anything about Mr. Kamala Mendoza specifically, like you said in her affidavit, she provided some information, at least that he was indigenous. But she didn't refer to anything about him specifically in her testimony that would support or explain how she reached this very high risk of harm that she provided. Instead, she referred to Guatemala just being a generally violent country. She talked about a potential client and trying to get the potential client's daughter into school. And then she talked about there being a high impunity rate, a very high impunity rate in Guatemala. Nothing in that testimony specifically refers to the Ms. Kempson-Aparicio, the expert witness in this case, stated that there's potentially 60% of the population is indigenous. And so why wouldn't that 90% risk of future harm also apply to that majority of the population? There wasn't an explanation here about what made this specific petitioner have that very high estimated risk of harm. And again, that goes to the persuasiveness of her testimony and whether it met the legal sufficiency, the legal burden of proof. You know, this case, I believe there was a 28-J filed for a recent case in Valasca, Samayoa. This case is not Valasca, Samayoa. In that case, well, first I should say that the government is considering further review in that case because of Ming Dai. But in that case, this court stated that the agency cannot require collaboration to an expert's opinion. But in that case, this court also found the expert's opinion to be very persuasive and pointed out that the expert in that case tied the individual characteristics of the petitioner to the estimated heightened risk of harm specific to that petitioner. So his age, that he had tattoos that made him appear to be a leader of gangs in his home country. There's nothing like that here in the actual testimony in this quantitative estimation of risk. So essentially, Your Honors, and then as for the affidavit, in the affidavit it also does not explain how a 90% number, how this very high quantitative estimation was reached. It does give more information. It certainly is some more evidence. But it doesn't explain, she doesn't make that estimation in her affidavit. She only made it in her testimony. And when she was asked to explain, she provided no explanation that was specific to the petitioner. And that goes to the all the indigenous people in Guatemala. But he, individually and specifically, would more likely than not suffer future torture. This court again, and so Ponce Salazar recently, stated that this is an extremely high threshold. That this is a very hard burden to satisfy. That it is more likely than not that he will be tortured. Not just harm. Not just discrimination. Not just that he could have another unfortunate run in. But that he would suffer extreme harm, extreme inhuman harm amounting to torture. And Your Honors, if I could just turn to internal relocation here as well. So this court, when looking at the actual facts of this case, doesn't need to reach government acquiescence. It doesn't necessarily need to reach past torture. It can do exactly as the court did in so Ponce Salazar and say, this petitioner could relocate to avoid future torture. Because the record does not compel the conclusion in this case that he couldn't return to Guatemala City, Guatemala and live without a more likely than not risk of torture. Again, torture, not harm being the important distinction there. When looking at the risk of future torture, when we're looking at internal relocation, this court's considering simply the possibility that the individual could relocate, not the reasonableness of relocation. And the reasons that Mr. Kama Mendoza gave for not being able to live in Guatemala City all go to reasonableness. He stated in his testimony that he's not familiar with the city. That he doesn't know anyone there. And when he was asked, could these specific Latinos from Todos Santos find you in Guatemala City? How would they do that? Because you explained to us previously that when they found you on the farm, it was because a bunch of individuals from your hometown had also worked on that farm and then went back to your hometown. And that's how the Latinos found you. Would that happen in Guatemala City? And he said he cannot decline or say yes that they would find him there. And instead, he linked his risk of future harm to at some point having to go back to my own And that's on page 133 of the record. So all of the reasons he gave that he could not relocate to Guatemala City were based on the reasonableness of relocating. But that's not the inquiry here. The inquiry is, is it possible that he can return to somewhere in Guatemala, such as Guatemala City, without having a more likely than not risk of future torture from the individuals that he fears? Again, the claim here is about this group of Latinos from his hometown involved in this dispute. And I would point out that in the record, he refers to his father continuing to live on the same land and does not report any continuing harm to his father. That the land is still in his family and his father still lives on it. He does state, I believe, that his father remains inside a lot of the time. But his father's not being tortured. What would increase his risk of being tortured? Specifically in Guatemala City, but even in Todos Santos, if a family member who is currently on the land that the Latinos want, this being this issue of a land dispute being the claim here. And then, your honors, if there are no further questions, I won't take up any of your time. Okay, this court should deny the petition for review. Thank you. Thank you. So, in response to the government's argument, I want to point out that we do not need to prove past torture to prevail here. That's not the question. And the question is whether there was any evidence that the government didn't really address that in its argument because the agency didn't evaluate that question below. And then, with respect to the expert's testimony, we're not just pointing to that phrase in isolation. We're pointing to the fact that the agency never addressed or engaged with any of the expert's testimony. The government can't point to a single piece of testimony from the expert that the agency engaged with, other than the quantitative risk assessment that the agency rejected. The government, however, is trying to read out the phrase that I pointed to where the IJ said that he was rejecting an considerable amount of the testimony as simply being inarticulate phrasing. But I think, in fact, that phrase reflects that the agency was not giving any weight to the expert's testimony. And then, the statement about country conditions at the end of the IJ's oral decision, that's the type of general statement that this is not sufficient when the record otherwise reflects that the evidence was not actually considered by the agency. And I'd also point out that when the IJ makes that statement about country conditions, it's not even specifically tied to the expert's analysis of country conditions. But even if you assume that it is talking about the expert's analysis of country conditions, that's the kind of throwaway statement that is not sufficient when the record otherwise shows that the agency did not actually consider the evidence. The government repeats the argument that her testimony is too broad, but it ignores all of the specific reasons that the expert gave, particularly in her affidavit, about why Mr. Kamel Mendoza would face the risk of harm. The quantitative risk assessment was based on the expert's expertise, but even if this court thinks that the quantitative risk assessment wasn't sufficiently supported, a remand would be required, as this court did in I.B. Barr, stating that even if an expert's quantitative risk assessment is not supported, if the agency does not consider the rest of the expert's testimony, a remand is required. And then on relocation, I just want to point out quickly that she's completely ignoring, as the agency did, all of the expert's testimony on why Mr. Kamel Mendoza could not relocate to Guatemala City and face the risk of torture there from Latinos, gangs, and the police. Thank you very much. Thank you very much, counsel. I want to thank Arik Harrington and Jennifer Keeley for appearing on behalf of Mr. Kamel Mendoza pro bono. That's very helpful to the court. And Kamel Mendoza v. Garland will be submitted. Thank you.
judges: WARDLAW, NGUYEN, OWENS